## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS

I, Steven Wellens, being duly sworn, depose and state as follows:

## I.    BACKGROUND & EXPERIENCE

1.    I am employed as a detective for the Milwaukee Police Department (MPD), and have been a law enforcement officer for 17 years. I have been a detective for the past 12 years. I am also a federally deputized task force agent for the United States Department of Justice, Drug Enforcement Administration (DEA). During my time as a detective, I have almost exclusively investigated violations of state and federal controlled substances laws and money laundering laws, including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses. I have had both formal training and have participated in numerous complex drug trafficking investigations, including ones using wiretaps.

2.    This affidavit is based upon my personal knowledge and information reported to me by other federal, state, and local law enforcement officers[1] during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is also based upon information gained from interviews with cooperating citizen witnesses, informants, and defendants, whose reliability is established separately herein.

3.    I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

4.    Because this affidavit is submitted for the limited purpose of securing the

---

[1] Throughout this affidavit, reference will be made to case agents. In this affidavit, case agents means those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

1

above-referenced criminal complaints, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are essential to establish the necessary foundation for the criminal complaints.

## II.   INDIVIDUALS FOR WHICH CRIMINAL COMPLAINTS ARE SOUGHT

5.     This affidavit is submitted in support of criminal complaints for the following individuals:

a. CALVIN L. COLEMAN, a.k.a. "C" (B/M, DOB: 12-16-68) - believed to be a large-scale supplier of cocaine to BOWIE and the primary user of several monitored telephones;

b. JIMMIE T. WATSON (B/M, DOB: 1-24-59) - assists COLEMAN in drug trafficking activities and a user of several monitored telephones;

c. KENYA RAGLAND (B/M, DOB: 1-13-76) - assists COLEMAN in drug trafficking activities and a user of several monitored telephones;

d. JARRELL A. HARRIS (B/M, DOB: 10-18-75) - cocaine distributor supplied by COLEMAN;

e. EDDIE CLAYBROOKS (B/M, DOB: 10-22-73) - cocaine distributor supplied by COLEMAN;

f. LEVEL LEE, a.k.a. "Big D" (B/M, DOB: 6-29-71) - cocaine distributor supplied by COLEMAN;

g. DEMETRIOUS A. THOMPSON, (B/M, DOB: 8-9-73) - a cocaine distributor supplied by COLEMAN;

h. DONIAY M. KNOX (B/M, DOB: 12-9-69) - a cocaine distributor supplied by COLEMAN;

i. LINDSEY K. FERGUSON (B/M, DOB: 3-6-73) - a cocaine distributor supplied by COLEMAN;

j. JIMMIE LEE DURANT (B/M, DOB: 7-24-70) - a large scale cocaine distributer supplied by Robert HAMPTON and the primary user of several monitored telephones;

2

k.      PATRYCE PRUITT (B/F, DOB:2-7-78) - the ex-wife of DURANT who assists DURANT in his drug-trafficking and money laundering activities; and

l.      ROBERT HAMPTON (B/M, DOB: 12-16-68) - DURANT's cocaine supplier and the primary user of several monitored telephones;

6.      As detailed below, there is probable cause to believe that the above listed individuals have committed violations of Title 21, United States Code Sections 841(a)(1), 841(b)(1)(a), 843(b) and 846, conspiracy to possess with the intent to distribute and distribute in excess of five (5) kilograms of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, and use of a communication facility to facilitate a drug trafficking crime..

## III.     SPECIFIC PROBABLE CAUSE INFORMATION

### A.     Pre wire-tap information and controlled buys[2] of cocaine.

7.      Federal, state and local law enforcement officers have been investigating the drug trafficking and money laundering activities of Jimmie L. DURANT, Calvin COLEMAN, and their associates for the past several months. Information gathered to date establishes that DURANT, COLEMAN, and others closely associated with them, have been involved in the sustained distribution of large amounts of cocaine and money laundering activities in the Milwaukee, Wisconsin area. The investigation to date has included traditional law enforcement methods, including, but not limited to: interviews with citizen witnesses, confidential informants and sources, and cooperating defendants; search warrants; the gathering and analysis of information from other

---

[2]A "controlled buy" is a law enforcement operation in which an informant purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the informant meets cases agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the informant while under the direction and control of case agents are recorded.

3

law enforcement agencies; the gathering and analysis of documentary evidence; consensually recorded conversations between confidential sources and members of the organization; controlled purchases of drugs; court-authorized intercepted wire communications to and from telephones used by members of the organization; the analysis of pen register, trap and trace, and telephone toll data; and physical surveillance.

8.      In early 2006, case agents developed a confidential informant (CS-7) who provided information to the case agents regarding the drug trafficking activities of Darin D. BOWIE. Case agents believe the information provided by CS-7 is truthful and reliable because the information was consistent with evidence obtained elsewhere in this investigation, the information was provided against the informant's penal interest, the information was provided in order for the informant to receive consideration in pending cases, and/or substantial portions of the informant's information has been corroborated through independent investigation, including recorded conversations. CS-7 told case agents that he/she began purchasing cocaine from BOWIE in October 2005. CS-7 started buying a ½ ounce of cocaine at a time and eventually moved up to buying 2 ounces of cocaine from BOWIE every 3 to 4 days, for a total of approximately 4-6 kilograms of cocaine from BOWIE during the past 4-5 months. In order to arrange the drug transactions, CS-7 contacted BOWIE by calling BOWIE's cellular telephone. According to CS-7, BOWIE taught CS-7 how to cook powder cocaine into crack cocaine. Telephone records for BOWIE's phone indicate CS-7's cellphone had numerous contacts with BOWIE's phone from October 2005 to March 2006.

9.      On July 10, 2006, CS-7 made a controlled buy of one ounce of cocaine for $750 from BOWIE. The controlled buy was set up by a recorded call between CS-7 and BOWIE. The cocaine had a weight of 27.8 grams and was placed on inventory.

4

10. On July 17, 2006, CS-7 made a controlled buy of one ounce of cocaine for $750 from BOWIE. The controlled buy was set up by a recorded call between CS-7 and BOWIE. The cocaine had a weight of 27.2 grams and was placed on inventory.

11. On August 2, 2006, CS-7 made a controlled buy of one ounce of cocaine for $750 from BOWIE. The controlled buy was set up by a recorded call between CS-7 and BOWIE. The cocaine had a weight of 27.9 grams and was placed on inventory.

**B.      Wire tap monitoring, surveillance, and controlled buys during September 2006.**

12. On September 7, 2006, Chief Judge Rudolph T. Randa, United States District Court of the Eastern District of Wisconsin, authorized monitoring of BOWIE's cellular telephone for a period of 30 days.[3] Subsequent monitored calls and surveillance established that BOWIE was supplied cocaine from Calvin COLEMAN (a.k.a. "C" and "Cal"). According to monitored calls, BOWIE obtained cocaine from COLEMAN approximately once every 10 days, getting up to 5 kilograms of cocaine at a time. BOWIE then distributed the cocaine in 1 ounce to 9 ounce quantities to several individuals. The calls further indicated that BOWIE and COLEMAN often used code words to mask their drug trafficking conversations. The code words often related to properties owned or controlled by BOWIE and COLEMAN. The following excerpts are summaries of pertinent telephone calls, surveillance, and controlled buys during this time period that substantiate the drug trafficking activities:

- On September 10, 2006, CS-7 made a controlled buy of two ounce of cocaine for $1,500 from BOWIE. The controlled buy was set up by a recorded call between CS-7 and BOWIE. The cocaine had a weight of 55.4 grams and was placed on inventory.

---

[3]Unless otherwise noted, all calls referenced or summarized in this affidavit were intercepted and monitored pursuant to judicial authorization pursuant to Title 18, U.S.C., §§ 2516-19.

- On September 11, 2006, at 11:44 a.m., COLEMAN called BOWIE and BOWIE asked COLEMAN if he was still working on those "projects." COLEMAN replied that he had one project together at that time. BOWIE asked if they were different because "those others weren't working," and COLEMAN replied that he had some good ones this time. Case agents believe that BOWIE and COLEMAN were discussing whether COLEMAN had additional amounts of cocaine and the quality of the cocaine.

- On September 19, 2006, at 12:49 p.m., COLEMAN called BOWIE and told BOWIE that it wouldn't be long (i.e. before more cocaine was available to him). At 2:37 p.m., COLEMAN called BOWIE and said that he was coming up to BOWIE's house at that time.

- At 2:39 p.m., SLIM (later identified as one of BOWIE's regular cocaine customers) called BOWIE and cut his previous order of 9 ounces of cocaine in half. BOWIE told SLIM that the price would be $29, and that he was meeting with his source (COLEMAN) right then. Almost simultaneous to the above referenced call, surveillance observed a black male, later identified by case agents as COLEMAN, walk up BOWIE's driveway and enter his residence. At 3:10 p.m., surveillance observed COLEMAN exit BOWIE's residence, walk down the driveway and get into a blue 1991 Buick Park Avenue bearing Wisconsin plate # 105-KZW. WDOT records indicate this plate lists to Calvin COLEMAN at 2959 N. 54th Street[4] (public records show no valid address at 2959 N. 59th St.). The vehicle left the area and was re-located at 4626 N. 52nd Street[5] parked in the driveway at 3:20 p.m. Based on the earlier calls and surveillance, case agents believe that COLEMAN dropped off a supply of cocaine for BOWIE at this time.

- On September 21, 2006, CS-7 made a controlled buy of 4 ½ ounces of cocaine for $2,900 from BOWIE. The controlled buy was set up by a recorded call between CS-7 and BOWIE. The cocaine had a weight of 119 grams and was placed on inventory.

## C.    Court-authorized monitoring and surveillance during October 2006.

13.    On October 6, 2006, Chief Judge Randa's original order authorizing interception of

BOWIE's telephone expired. On October 6, 2006, Judge Randa authorized continued monitoring

---

[4]Unless otherwise noted, all addresses in this affidavit are located in the City of Milwaukee, and within the State and Eastern District of Wisconsin.

[5]Public records show that Bessie Coleman, Calvin COLEMAN's mother, owns 4626 N. 52nd St., a three-unit residential building. The records further indicate that Bessie Coleman owns 2939/41 N. 54th St., a duplex, and that Bessie Coleman lives in the lower residence, 2939, and the upper residence, 2941, is vacant.

Case 2:07-cr-00123-LA    Filed 05/09/07    Page 6 of 45    Document 1-1

of BOWIE's telephone. Interception commenced on October 7, 2006, and expired on November 5, 2006. The following summaries are excerpts of intercepted telephone calls during October 2006:

- On October 2, 2006, at 8:20 a.m., BOWIE called COLEMAN and asked, "What's happening with you." COLEMAN replied that he could not "catch dude last night," but that he was going over there "right now." Case agents believe that BOWIE was attempting to obtain cocaine and that COLEMAN was using code to tell BOWIE that he did not get a hold of his own supplier (later identified as Jimmie L. DURANT) but was on his way to see the supplier.

- On October 8, 2006, at 6:41 p.m., COLEMAN called BOWIE and said he was just getting back and told BOWIE that he would get with him soon. BOWIE told COLEMAN that "DOG" (later identified as one of BOWIE's regular cocaine customers) had been calling and calling.

- At 7:40 p.m., COLEMAN called BOWIE and told BOWIE that he was around the corner from BOWIE's house. At 7:42 p.m., surveillance observed COLEMAN leave 4626 N. 52nd St., enter his blue Buick Park Avenue, and drive directly to BOWIE's residence at 4678 N. 54th St.

- At 7:42 p.m., BOWIE called DOG and asked if it was all there. DOG replied, "Yes, I'm taking 2850." BOWIE corrected DOG, stating "No, 29 dollars a piece." BOWIE told DOG that he would be at "11 dollars and 6 cents." DOG said, "Alright." Case agents believe that BOWIE called DOG to make sure he had the money for the cocaine that DOG had been asking for and was ready to make the transaction. Case agents also believe that BOWIE and DOG were arranging a cocaine transaction involving ½ kilogram of cocaine for the price of $11,600.00.

- At 7:45 p.m., surveillance observed COLEMAN park directly in front of BOWIE's residence and observed BOWIE exit his house and approach the passenger side door of COLEMAN's vehicle.

- At 7:48 p.m., BOWIE called DOG and directed DOG to meet him at 6222 W. Fond du Lac Avenue and pretend that they were looking at the car that BOWIE had for sale on the corner. Surveillance observed the meeting between BOWIE and DOG, and observed BOWIE carrying a white plastic bag after he met with DOG. Case agents believe this bag to have contained money owed to BOWIE from DOG.

- On October 25, 2006, at 11:30 a.m., surveillance observed several vehicles at 4927 W. Luscher, including a maroon Chevy Lumina with no plates and a tan/brown 1993 Chevy Suburban. WDOT records show that the Suburban is listed to Geisha Lashone Jordan at 5001 N.46th St. Public records indicate that 4927 W. Luscher Avenue is

7

a four-unit residential building owned by Calvin COLEMAN. A utility check revealed that Calvin L. COLEMAN is listed on the utilities at 4927 W. Luscher. Telephone records indicate that 303-9222, a number subscribed to Jimmie T. WATSON, Jr. at 4927 W. Luscher, has had numerous contacts with COLEMAN's telephone. A criminal history check also revealed that Jimmie T. WATSON, Jr. was convicted on January 4, 2006, for felony delivery of cocaine in Milwaukee County Circuit Court. WATSON was sentenced to 18 months prison stayed in lieu of 3 years probation.

- At 12:40 p.m., surveillance observed COLEMAN arrive at 4626 N. 52nd St., driving a 2000 Buick Regal bearing Wisconsin plate # 516-KCM. Throughout this investigation, case agents conducting surveillance have repeatedly observed COLEMAN driving this vehicle while engaged in drug trafficking activities. Wisconsin Department of Transportation records list this plate to Ashly Humphrey at 3862 N. 52nd St. At approximately 1:00 p.m., surveillance observed COLEMAN meet with an unknown black male (U/M) at the front of his residence at 4626 N. 52nd St. COLEMAN was seen taking money out of his pocket and paying the U/M and then tossing a set of keys to the U/M. The U/M then got into the maroon Buick Regal and drove from the area.

- At 1:13 p.m., BOWIE called COLEMAN and asked COLEMAN when COLEMAN was coming over to look at BOWIE's furniture. COLEMAN stated that he was hoping to come over this afternoon to see the furniture and "You know what I am saying." Case agents believe COLEMAN used code to tell BOWIE that he was hoping to be re-supplied with cocaine by his supplier that day.

- On October 26, 2006, at 4:04 p.m., COLEMAN called BOWIE and stated he was coming to BOWIE's and would call in about 30 to 40 minutes.

- At 4:05 p.m., BOWIE called DOG and said that "dude" (COLEMAN) had just called and said they were on the job site and would be ready in an hour. DOG asked if he had to pay the contractors right away. BOWIE stated that DOG would have to pay. Case agents believe that BOWIE told DOG that he should be re-supplied by COLEMAN within the hour and also that he would not front, or give cocaine to DOG without being paid first.

- At 6:30 p.m., COLEMAN called BOWIE and said he was at BOWIE's back door. At 6:34 p.m., surveillance observed COLEMAN driving the GMC truck in front of BOWIE's residence at 4678 N. 54th St. At 6:39 p.m., surveillance observed COLEMAN enter the GMC truck, then travel south on N. 54th St. towards the Lincoln Creek Parkway. Due to poor lighting and heavy traffic in the area, surveillance lost sight of the GMC truck at this time.

8

- At 6:43 p.m., BOWIE called DOG and said that as far as he could go with DOG then was "two kids at 29 dollars a piece." DOG asked if he could get some off of the sale and BOWIE related that they would talk. Case agents believe that BOWIE sold 9 ounces of cocaine to DOG for $5800.00.

- On October 28, 2006, at 1:43 p.m., BOWIE called COLEMAN and asked if COLEMAN got that paperwork filled out yet. COLEMAN replied not yet. BOWIE stated he is glad that he keeps some copies. COLEMAN stated he has one of them fine line paper work and one of the little pad of papers. COLEMAN stated "You know when I go to Dairy Queen". BOWIE replied "oh yeah, the bananas." COLEMAN stated that they are like 2 dollars and eighty cents. BOWIE then replied he was going to look at his paper work to make sure he was "all good." Case agents believe COLEMAN was telling BOWIE that he has 4 ½ ounces of cocaine left for a price of $2800.00.

- At 2:19 p.m., BOWIE called COLEMAN. A subject later identified as Kenya RAGLAND answered COLEMAN's telephone and then handed the phone to COLEMAN. COLEMAN and BOWIE discussed doing a cocaine deal at COLEMAN's car wash. Public records indicate that COLEMAN owns "Personal Touch Car Wash" located at 3716 N. North Avenue, Milwaukee.

## D.  Court-authorized monitoring and surveillance during November 2006.

- On November 6, 2006, at 8:38 a.m., COLEMAN and BOWIE talked about whether COLEMAN made contact yet with his "guy" (DURANT, COLEMAN's cocaine supplier). COLEMAN told BOWIE that he would catch up with his guy and stop by his "crib" (house).

- At 3:56 p.m., COLEMAN called a subject later identified as Jimmie WATSON and told WATSON to stop by an unknown male's (U/M) house and see what he's got (money). COLEMAN said he went over there and talked to him the other day. WATSON asked COLEMAN if COLEMAN had a pistol and COLEMAN told WATSON that he did not need a pistol and that he (COLEMAN) is not scared of anyone. COLEMAN said that he did not buy the house for dude to live there free of rent.

- On November 7, 2006, 7:51 a.m., COLEMAN called a subject later identified as Lindsey K. FERGUSON and asked whether or not FERGUSON was going to do that for him. FERGUSON said he "ain't even got that much going on." FERGUSON said he was "about 23 bills out of the way," and that "he don't do nothing but little things and hustles for that." FERGUSON said he would try to see if he can call his guy and see if he can grab his stuff (money).

9

- At 8:23 a.m., COLEMAN called WATSON and asked WATSON "what you looking like." WATSON replied "lookin' a little shady still" (still short $).

- At 2:30 p.m., WATSON called COLEMAN and said that he was riding with a subject later identified as Kenya RAGLAND. COLEMAN asked WATSON to pick COLEMAN up.

- On November 8, 2006, at 10:02 a.m., COLEMAN called FERGUSON and DOE #4 told COLEMAN that his guy called him and said the 11th and he was getting it (money) together. DOE #4 said his guy wanted to know if he could do the usual and wanted to know if he could do the "3 bananas for 16 dollars."(amount of cocaine and price).

- At 5:48 p.m., COLEMAN called RAGLAND and asked RAGLAND if he was "straight." (is everything ok). COLEMAN then told RAGLAND that will be out of there (the track) soon.

- At 6:17 p.m., a subject later identified as Eddie CLAYBROOKS called RAGLAND and asked RAGLAND where he is at. RAGLAND said that he by the apartment, by the "joint." RAGLAND stated that he did not go to the track. CLAYBROOKS said that he would be over there (where RAGLAND was at) in a minute.

- On November 9, 2006, at 10:53 a.m., a subject later identified as Level LEE called COLEMAN and asked COLEMAN "What's going on." When COLEMAN replied "You know, " LEE stated "Shit, when I hear something." Case agents believe that LEE was waiting on money to pay COLEMAN.

- At 11:14 a.m., BOWIE called COLEMAN and asked COLEMAN if he caught up with dude (main cocaine supplier). COLEMAN said no, but he caught up with another two (received two kilograms of cocaine from another source). COLEMAN told BOWIE there is probably no telling where the other guy (supplier) is at. Case agents believe that COLEMAN said that his usual supplier did not supply him with cocaine, but he was able to get 2 kilograms of cocaine from another source.

- At 12:27 p.m., LEE called COLEMAN and said that he was ready (has money) for COLEMAN. COLEMAN told LEE to come over this way (COLEMAN told LEE to meet with him to transfer money for a quantity of cocaine).

- At 12:35 p.m., surveillance observed COLEMAN walk out of the residence at 4626 N. 52nd Street to meet a person who was later positively identified as Level LEE. COLEMAN and LEE talked for approximately 2-3 minutes before entering the front door of COLEMAN's residence.

10

- At 6:40 p.m., surveillance in the area of COLEMAN's car wash located at 3716 W. North Avenue, observed the previously described silver mini van, bearing IL license plate 7909098, parked unoccupied in the rear alley. A few minutes later the van was moved to the 2300blk. of N. 37th St. In the course of approximately 1 hour, surveillance observed a high frequency of foot and vehicular traffic coming and going from the car wash from the alley.

- At 6:50 p.m., COLEMAN called CLAYBROOKS and told CLAYBROOKS that he is going to be down at the car wash for a meeting. CLAYBROOKS asked COLEMAN if he wants him to come down there and COLEMAN told CLAYBROOKS yes and said RAGLAND will be "grandma's house, you can just get after him, and I will get with you after I get out of there." CLAYBROOKS asked COLEMAN if he could get a carwash when he is up there and COLEMAN said "No body washing any cars." Case agents believe that CLAYBROOKS and COLEMAN were setting up a cocaine transaction.

- At 6:52 p.m., COLEMAN called a subject later identified as Demetrious THOMPSON and THOMPSON said "you want me to call Kenya?" (RAGLAND). COLEMAN said RAGLAND was going to be at "grandma's house." COLEMAN said grandma lives behind the car wash across the alley. COLEMAN told THOMPSON that RAGLAND would be there in 20 minutes. COLEMAN told THOMPSON that RAGLAND was with him right now. THOMPSON asked how RAGLAND would see him in the alley and COLEMAN said RAGLAND will know when you are there.

- At 7:41 p.m., CLAYBROOKS called COLEMAN and asked where RAGLAND was at. COLEMAN asked where CLAYBROOKS was and CLAYBROOKS said he was at the car wash. COLEMAN said he is standing outside and sees CLAYBROOKS (CLAYBROOKS arrives at the car wash for a cocaine transaction).

- At 7:44 p.m., surveillance at the car wash observed a tan Nissan Maxima bearing WI license 444-LHM drive into the alley by the car wash. A black male exited the car wash and entered the passenger side of the Maxima. The driver of the Maxima turned off the lights of the vehicle. At 7:51p.m., the passenger exited the Maxima and re-entered the car wash. The lights of the Maxima were turned back on and the vehicle left westbound in the alley. WDOT records list the above described plate to Eddie L. CLAYBROOKS (DOB: 10-22-73) of 1815 Thurston Avenue, Racine, WI, on a tan 1996 Nissan Maxima.

- At 8:23 p.m., surveillance observed numerous vehicles leaving the car wash at 3716 W. North Avenue. Surveillance followed a vehicle that left the car wash to obtain a license plate. While attempting to obtain information on the vehicle, surveillance observed the vehicle slow down, causing the surveillance vehicle to pass, and then

11

begin following the surveillance vehicle. As case agents attempted to leave the area, the vehicle attempted to pull alongside the surveillance vehicle in an apparent attempt to look at the surveillance driver.

- On November 10, 2006, at 4:46 p.m., a subject later identified as Daryl BATES called COLEMAN and asked COLEMAN if he is over at the place. COLEMAN said no, and that its dead on his end anyway, probably till Sunday. COLEMAN told BATES that the only one that has some (cocaine) is dude. BATES said he will call "DUKE" and then asked if Sunday will be the same tools (cocaine). COLEMAN said "I hope better." BATES said "it can't be better than the 85 shit" and COLEMAN said "From what they're talking, its soft like butter, feels like Charmin tissue." COLEMAN said "I'm just waiting." Case agents believe COLEMAN is waiting for the new supply of cocaine that may be better quality.

- On November 11, 2006, at 1:51 p.m., BOWIE called COLEMAN and asked if COLEMAN had more clothes (cocaine). COLEMAN said he has to check.

- On November 12, 2006, at 11:22 a.m., COLEMAN called WATSON and asked WATSON what (how much cocaine) was in there. WATSON responded that there is two (kilograms) and a little bit.

- At 12:41p.m., COLEMAN called BOWIE and said he was on his way to BOWIE's. BOWIE told COLEMAN to come to the front door.

- At 4;21 p.m., LEE called COLEMAN and asked COLEMAN if he has seen RAGLAND. COLEMAN said "you look'in for him real good?" LEE says "I'm looking for what I do. I can't find nothing." COLEMAN said that if he saw RAGLAND he would have RAGLAND call LEE. (LEE is looking for cocaine and asking COLEMAN if Kenya has any).

- On November 13, 2006, at 11:41 a.m., LEE called COLEMAN and RAGLAND answered the call and said he was with "C." (COLEMAN). LEE said he is "in search" (looking for cocaine) and told RAGLAND that he has all the stuff (money) too. RAGLAND told LEE that he is on that.

- At 3:54 p.m., COLEMAN called CLAYBROOKS and told CLAYBROOKS that nothing is going on (no cocaine) and that he learned patience when he went to the joint. COLEMAN said he does not rush anything because you never know what might come out of it. COLEMAN said he "ain't fucking with nobody else around this motherfucker." CLAYBROOKS told COLEMAN to hit him up when he does something, or CLAYBROOKS will call him in the morning. Case agents believe that COLEMAN said that he will wait for the cocaine as long as it takes, and is not going to go to someone new because you never know if they are trying to set you up.

12

- At 6:21 p.m., COLEMAN called LEE and LEE asked what was going on. COLEMAN talked about when he went to the joint he learned patience like a mother fucker. COLEMAN said "he ain't going to fuck with nobody else around this mother fucker, you should know that." During the call, COLEMAN took a call for another phone and told the unknown caller that he (COLEMAN) was out making runs. When COLEMAN got back on the line with LEE, LEE told COLEMAN to just call when he knows something, or LEE will call in the morning. (LEE asked COLEMAN if there is any cocaine available).

- On November 14, 2006, at 4:09 p.m., John DOE #1 called COLEMAN and asked COLEMAN to bring his gloves and baking soda. Case agents believe DOE #1 asked COLEMAN to bring some cut for turning powder cocaine into "crack cocaine."

- On November 15, 2006, at 10:35 a.m., BATES called COLEMAN and asked COLEMAN if he can come by and pick up half of them "tools." BATES told COLEMAN to call him back on his 469 phone number. COLEMAN told BATES that he will call him back around eleven. (BATES is attempting to receive a quantity of cocaine.)

- At 11:40 a.m., COLEMAN called WATSON and told him that COLEMAN has to grab that "thing" from him. COLEMAN stated, "that little black thing in that bottle." WATSON asked COLEMAN if COLEMAN wants him to bring it to him. COLEMAN told WATSON "just take it over there to that apartment." (COLEMAN told WATSON to bring a quantity of cocaine to 4626 N. 52nd St.).

- At 12:22 pm, COLEMAN called WATSON and told WATSON to set it (cocaine) in the back of the wheel on the R.V. COLEMAN also asked WATSON if he has that little change (money) for him. WATSON told COLEMAN that he does. Case agents know that there is an R.V. parked on the driveway of 4626 N. 52nd Street.

- At 12:29pm, COLEMAN called BATES and BATES asked COLEMAN if COLEMAN is good. COLEMAN affirmed and BATES told COLEMAN that he will be behind the spot in ten minutes. (BATES told COLEMAN that he will be coming to pick up the cocaine and will be waiting behind the house at 4626 N. 52nd Street).

- At 12:35 p.m., surveillance observed COLEMAN walk towards his residence at N. 52nd St. and appeared to come from an unknown vehicle. COLEMAN walked towards the back of the residence and out of sight.

- At 12:44 p.m., surveillance observed a dark blue Oldsmobile Aurora bearing WI plate number 155-KLN with dark tint and rims pull up in front of the residence. A white male exited the vehicle and walked towards the rear of the residence.

13

- At 12:47 p.m., surveillance observed the above-described white male walk from the rear of the residence and back to the car he arrived in. The white male entered the car and made a Y-turn, so as to go south bound on N. 52nd Street. Case agents also noted that it appeared that the white male had something cupped in his left hand. The vehicle traveled south on 52nd St. to Glendale Ave., where the vehicle turns east. As the vehicle stopped at 51st and Glendale, case agents noted that the vehicle stayed at the stop sign for approximately one minute before turning south onto N. 51st St. Surveillance then followed this vehicle southbound on 51st to Fond Du Lac Ave., where the vehicle made a turn to head southeast. Surveillance followed the vehicle to Fond Du Lac and Wright St., where the vehicle stopped at the Chicago Hot Wing and Seafood store at approximately 12:59 p.m. After several more minutes of surveillance, case agents lost the vehicle in heavy traffic. Case agents checked the address of W249N7958 Hillside Road in Sussex. Agents observed a Red Mitsubishi bearing WI plate number TYN596 and black/tan conversion van parked at the residence. The license plate lists to Daryl A. BATES (06/05/1972) at that address.

- On November 19, 2006, at 5:41 p.m., a subject later identified as Jimmie DURANT, whom case agents believe to be COLEMAN'S supplier, used the direct connect feature[6] of his telephone to contact COLEMAN. DURANT said he was going to "make that move in the morning." Case agents believe that DURANT told COLEMAN that he was going to pick up cocaine. DURANT then told COLEMAN to "grab that stuff" (money) because DURANT's sister was going to "grab that stuff" (cocaine). COLEMAN told DURANT to give him some prices (for cocaine) on that.

- On November 21, 2006, at 11:51 a.m., case agents conducted surveillance and observed a light blue Lexus SUV, bearing WI registration plates 217-KPE, parked at COLEMAN's residence at 4151 N. 61st St.. Case agents also observed COLEMAN and DURANT at the residence. WDOT records indicate that the blue Lexus is listed to Travis LANDRY on a lease from Toyota Motor Credit Corporation. Case agents observed DURANT enter the blue Lexus and drive to an auto mechanic's garage near N. 20th St. and W. Keefe Avenue.

- At 12:03 p.m., COLEMAN chirped DURANT and told DURANT that RAGLAND is out there by COLEMAN. DURANT told COLEMAN to have RAGLAND go to N. 11th St. and W. Locust St. (public records indicate that COLEMAN owns a property at 2961 N. 11th St. that he rents out).

- At 12:17 p.m., case agents observed the blue Lexus leave the garage and followed the

---

[6] The direct connect feature is a two-way walkie-talkie service that several cellular telephone companies offer to customers. The user of the feature "chirps" the intended recipient in order to initiate a conversation. The feature is regularly used by businesses and has become increasingly popular with drug traffickers.

14

vehicle on I-94 southbound to the Lake Forest Oasis in Illinois. While traveling southbound on I-94, case agents observed DURANT driving the blue Lexus in the right hand lane as the vehicle approached the highway intersection of I-57 south, as if committing to go south on I-57. At the last minute, DURANT erratically drove to the left lane to go south on I-94. Case agents believe DURANT's erratic driving was intentional in order to deter police surveillance. Case agents followed the blue Lexus to a large apartment building located at 13713 Stewart St. in Riverdale, IL. DURANT was later observed entering the building. Case agents later learned that DURANT's supplier, later identified as Robert Hampton, lives in this building.

- At 8:20 p.m., DURANT was observed leaving the apartment building with a large bag and entered the blue Lexus. At 8:50 p.m., DURANT was followed to the 300 block of Merill St., in Riverdale, IL. Case agents were unable to see what residence DURANT entered due to the lack of visibility. Surveillance was terminated at 11 p.m. because the Lexus was still parked on the street and case agents did not again observe DURANT.

- On November 22, 2006, at 7:33 a.m., DURANT chirped COLEMAN and asked "What is it (cocaine) in, the truck or the van?" COLEMAN said RAGLAND brought the van over there last night and COLEMAN asked "The truck ain't out there?" DURANT said no and COLEMAN said he would call him (RAGLAND) right away.

- At 7:38 a.m., COLEMAN chirped DURANT and COLEMAN told DURANT that RAGLAND was at McDonald's and then asked where DURANT was at. DURANT said he was at 49 (4927 W. Luscher Avenue). DURANT told COLEMAN to tell RAGLAND to meet him there.

- At 7:57 a.m., COLEMAN called RAGLAND and told RAGLAND that DURANT was coming to get the black TV and two of them (cocaine). RAGLAND asked if DURANT was coming to get it (the cocaine). At the same time as the above call, case agents observed the blue Lexus and COLEMAN's tan Suburban parked in the rear parking lot of 4927 W. Luscher Avenue.

- At 8:05 a.m., case agents observed three black males leave the Luscher address. Two of the males entered the blue Lexus and one entered the Suburban. Both vehicles were followed to at 4626 N. 52nd St.

- At 8:24 a.m., COLEMAN called a subject later identified as Jarrell HARRIS and told HARRIS that it was not looking good. COLEMAN said that it would probably not be until after Thanksgiving. COLEMAN said "motherfucker (DURANT) went that way (to Chicago), but they (their supplier, HAMPTON) was talking about after Thanksgiving." COLEMAN said "it gets like this time of year." HARRIS said "all you can do is wait." Case agents believe COLEMAN indicated that he had not been

15

re-supplied with cocaine.

- At 12:52 p.m., LANDRY called COLEMAN and asked "What's up with them niggas (supplier) man?" COLEMAN said "Man they (DURANT) said dude (HAMPTON) didn't want to move over the weekend or whatever. I just got through talking to my guy (DURANT). He said he is going to get up outta here in the morning. I guess they be funny about them holidays, but he (DURANT) say he is going to get up out of here this morning. I mean in the morning." LANDRY said "then it is all good then, dog; I was just trying to see what was up with them niggas (supplier)."

- On November 26, 2006, at 5:30 a.m., case agents observed LANDRY's blue Lexus parked on a rear parking slab at COLEMAN's residence, 4151 N. 61st St. At 9:02 a.m., surveillance observed COLEMAN exit the residence at 4151 N. 61st St. and enter the blue Lexus. COLEMAN was followed to the area of N. 55th St. and W. Chambers St. where the vehicle was lost in traffic. At 9:19 a.m., surveillance observed the blue Lexus and COLEMAN's Chevy Suburban parked in the rear alley of 2939/41 N. 54th St., the residence of COLEMAN's mother. At 9:21a.m., the vehicles left in opposite directions and surveillance was temporarily terminated due to the erratic and unsafe driving of both vehicles.

- At 9:28 a.m., case agents located both the blue Lexus and the Chevy Suburban parked in front of 2209 N. 29th St., facing southbound, across the street from 2210 N. 29th St. a residence of Jimmie DURANT. At 9:30 a.m., surveillance observed DURANT walk to the passenger side of the Chevy Suburban and retrieve an unknown object from inside the vehicle. DURANT was then observed using a key to open a security gate at 2210 N. 29th St. and then enter the residence. A short time later, DURANT exited the residence, entered the blue Lexus, and drove away. The vehicle was followed onto I-94 southbound and then to the General Mitchell Field Airport. Surveillance observed DURANT exit the vehicle and approach the Dollar Rent A Car booth. Case agents then followed DURANT to the Dollar parking lot and observed him enter a maroon Jeep Liberty bearing IL plate 9623171. A check of the plate with WDOT revealed the registration is listed to Dollar Rent A Car on a 2006 Jeep. During this time, surveillance observed the blue Lexus to contain COLEMAN, an unknown female, and a child in the blue Lexus. Surveillance lost the Jeep as it exited the airport spur southbound on I-94 towards Chicago.

- At 2:11 p.m., surveillance observed the maroon Jeep Liberty rental vehicle parked facing southbound in front of DURANT's residence at 2210 N. 29th St. Also parked at this location was COLEMAN's Chevy Suburban. At 2:17 p.m., surveillance observed DURANT leave his residence, enter the Jeep, and drive to various locations within the city limits of Milwaukee.

- At 6:50 p.m., surveillance followed DURANT to 4927 W. Luscher Ave., another

16

residence associated with COLEMAN and believed to be a stash house used by COLEMAN, DURANT, and their associates. On his way to the residence, DURANT made two U-turns and drastically varied the speed of the Jeep. Case agents believe that DURANT's erratic driving was intended to determine whether surveillance units were in the area. Upon arrival, DURANT entered 4927 W. Luscher Ave. through the front door.

- At 7:08 p.m., surveillance observed DURANT exit the residence, enter the Jeep, and drive away. The vehicle was then temporally lost by surveillance. At 7:44 p.m., surveillance observed the Jeep arrive at DURANT's residence, 2210 N. 29th St. Case agents observed DURANT looking around for surveillance units as he walked up to the residence and entered with keys. The headlights of the Jeep remained illuminated while parked in front of the residence. At 7:47 p.m., the Jeep drove away. Case agents observed someone inside DURANT's residence looking out the window. DURANT was observed driving the rented Jeep with the hazard lights on. At 8:37 p.m., surveillance observed DURANT drive to 4927 W. Luscher St. Due to lighting conditions and DURANT's counter-surveillance actions, surveillance was terminated to avoid detection.

- On November 27, 2006, at 7:06 a.m., COLEMAN chirped DURANT and DURANT told COLEMAN that he would probably see COLEMAN later in the day because he (DURANT) "did not make that move yesterday." Case agents believe DURANT was planning on making a trip to Chicago to meet the supplier.

- At 7:07 a.m., COLEMAN called LANDRY and told LANDRY that "Rel" (Jarell HARRIS) is on the other end calling him and is he (COLEMAN just waiting for dude (COLEMAN'S supplier) to get back

- At 11:29 p.m., surveillance observed DURANT pull up to 4927 W. Luscher St. driving the rented Jeep Liberty. Case agents observed DURANT park at the rear of the residence and exit the vehicle with a dark colored back pack or duffle bag over DURANT's left shoulder. Case agents then observed DURANT enter the building.

- At 11:33 p.m., DURANT chirped COLEMAN and informed COLEMAN that he just got in (from Chicago). COLEMAN asked DURANT if he (DURANT) was straight (did he obtain cocaine). DURANT said no and that he would contact COLEMAN.

- On November 28, 2006, at 8:23 a.m., LANDRY called COLEMAN and asked if COLEMAN's guy came back yet. COLEMAN said no he stayed over. LANDRY then said "Dog sweatin". COLEMAN said he has the majority of what's its name that he (HARRIS) wants. LANDRY said he (HARRIS) might need it because he has to go out of town Thursday morning for a death in the family. COLEMAN then said he has to wait until dude gets back (from meeting with the supplier). COLEMAN said if he

17

actually wants it today by that time dude will be back. LANDRY told COLEMAN to just wait until dude gets back. Case agents believe LANDRY has HARRIS waiting to be re-supplied cocaine and COLEMAN is telling LANDRY that he should have cocaine in today if DURANT goes to Chicago.

- At 3:04 p.m., COLEMAN chirped DURANT and DURANT told COLEMAN that he might need COLEMAN to role with him. Case agents believe DURANT is telling COLEMAN that today he might go to Chicago to meet with the supplier.

- At 7:00 p.m., LEE called COLEMAN and asked if that is a different type of flavor (cocaine). COLEMAN replied that he has not seen a flavor (cocaine) in about 2-3 weeks.

- On November 29, 2006, at 6:46 a.m., COLEMAN called DURANT and told DURANT that he was up. DURANT then said around 1 or 2 o'clock. Case agents believe DURANT was telling COLEMAN that he would be ready around 1 or 2 o'clock to make a trip to receive cocaine.

- At 12:53 p.m., BATES called COLEMAN and asked COLEMAN about the "tools" (cocaine). COLEMAN said it has been rough and he's hoping that this motherfucker brings him his toolbox (cocaine) today. COLEMAN said that it's rough for him and he has been off work personally for three weeks, almost a month. COLEMAN said he was missing it, but as long as he had something coming, he was straight.

- At 5:43 p.m., COLEMAN called Level LEE and LEE asked COLEMAN if there was light at the end and COLEMAN replied that he was waiting for a phone call (from his supplier).

- At 5:48 p.m., LANDRY called COLEMAN and asked if his (COLEMAN's) guy came through. COLEMAN said he is waiting for his guy (DURANT) to call him back.

- At 6:48 p.m., THOMPSON called COLEMAN and said he wanted to meet up with COLEMAN to give him some money. COLEMAN told THOMPSON to call when he meets up with his (Kenya RAGLAND) cousin.

- On November 30, 2006, at 6:42 p.m., BOWIE called COLEMAN and asked what was happening and said that he called about that paperwork (money) all day. COLEMAN said good and to give him a minute. Case agents believe BOWIE told COLEMAN that he had a money payment to COLEMAN for delivered cocaine.

- At 8:37 p.m., COLEMAN called BOWIE and told BOWIE he was coming over and would see BOWIE in a minute. At 8:54 p.m., COLEMAN called BOWIE and told

18

BOWIE he was at the side door (of BOWIE'S residence).

- At 9:38 p.m., a subject later identified as Doniay KNOX called COLEMAN and told COLEMAN that he wanted to go to 14th St. (14th St. refers to ½ ounce of cocaine). KNOX said that he could come to COLEMAN and COLEMAN told him to come to 52nd and Glendale (4626 N. 52nd St). During a later call at 10:52 p.m., KNOX told COLEMAN that he was on his way. COLEMAN told KNOX that the address was 4626 (4626 N. 52nd St.) and KNOX stated that he would be there in two or three minutes.

## E.   Court-authorized monitoring and surveillance during December 2006.

- On December 1, 2006 at 8:30 a.m. COLEMAN called KNOX and asked him where he was at. KNOX stated that he could not get his van started, but told COLEMAN that he would be there in 15 minutes. At 8:53 a.m. KNOX called COLEMAN and told him that he would be there in two minutes. (Agents believe KNOX was meeting COLEMAN to either pay for previously delivered cocaine or to conduct a new transaction.)

- On December 2, 2006, at 9:31 a.m., COLEMAN called BOWIE and asked BOWIE if he wanted him to bring over the salt (cocaine). BOWIE said he could sure use it.

- At 9:48 a.m., COLEMAN called BOWIE and said that he was on the way. At approximately 9:54 a.m., surveillance set up in the area of BOWIE's new residence at 6454 N. 81st Street. Surveillance observed BOWIE standing in the front window looking up and down the street. At approximately 9:58 a.m., surveillance observed COLEMAN in LANDRY's blue Lexus park facing north in front of BOWIE's residence. Surveillance observed COLEMAN exit the vehicle and walk towards the south side door and enter BOWIE's residence. At 10:04 a.m., surveillance observed COLEMAN return to the Lexus SUV and enter the driver's seat. Surveillance discontinued focus on COLEMAN and observed BOWIE make a delivery of cocaine to a customer.

- At 12:28 p.m., HARRIS called COLEMAN and COLEMAN said he found out what the business was and what was going on (with his supplier). HARRIS said he was looking for a deuce (two kilograms of cocaine). COLEMAN replied "motherfucker" (DURANT) came back with only like a deuce (two kilograms of cocaine). COLEMAN told HARRIS that DURANT took too long to get down there (meet the supplier) and that is all they (supplier) had left (referring to the two kilograms of cocaine the suppliers had left). COLEMAN then told HARRIS to just send that (money), and that would be cool. COLEMAN then said his guy (DURANT) would leave Sunday and would be ready Monday so he was getting the stuff together (collecting money to give to DURANT to give to the suppliers).

19

- On December 4, 2006, at 4:57 p.m., LEE called COLEMAN and asked if it was a go (meaning does COLEMAN have cocaine) and COLEMAN replied yes. A minute later, LEE called COLEMAN and said it was going to be on 33rd St., but LEE's guy (cocaine customer) would not be ready until 8:00 or 8:30 p.m.

- At 8:54 p.m., COLEMAN called WATSON and said he was leaving the house right now. WATSON said he was on Fond Du Lac and Wright St., and he had to go to the house at 38th and Nash to pick that (cocaine) up and said he did not want to ride around with it.

- On December 5, 2006, at 7:47 a.m., COLEMAN chirped DURANT and DURANT told COLEMAN that he wanted to get them tiles (cocaine) from COLEMAN. COLEMAN said he was going over there and told DURANT to tell them (associates) to open the garage.

- At 11:47 a.m., COLEMAN called BOWIE and said he was right down the street from BOWIE. BOWIE told COLEMAN to stop on by (to deliver cocaine).

- At 1:19 p.m., WATSON called COLEMAN and told COLEMAN he was putting the clothes in the wash (cooking or cutting cocaine) and "them motherfucker's was just not right." WATSON said he did half of it already and not even that was coming through. COLEMAN said "shit" and not to "even fuck with the other part" and when he gets out he will hit WATSON up (meaning he would show WATSON how to cook up or cut up the cocaine right).

- On December 7, 2006, at 10:07 a.m., COLEMAN chirped DURANT and DURANT told COLEMAN that it (money) came out to 1260. DURANT said that the 27 that COLEMAN gave him came only out to 1260. COLEMAN asked if DURANT was sure. DURANT said, "yeah, because it was just in one." COLEMAN said the change that he gave DURANT was the 27. DURANT said it was not 2, it was 1260. COLEMAN said, "are you sure, because I counted it before I brought it to you." Case agents believe DURANT and COLEMAN were talking about collecting and counting money that was to be given to the supplier in Chicago. Case agents believe that each time DURANT and COLEMAN obtain cocaine from their supplier in Chicago, they usually obtain multiple kilograms of cocaine at a time. At an average price of $18,000 per kilogram, case agents believe that DURANT and COLEMAN were discussing $270,000 (15 kilograms at $18,000 per kilogram) for their next delivery of cocaine.

- On December 11, 2006, at 1:54 p.m., COLEMAN called BATES and BATES said he stopped by the shop on Saturday for some information because he found that paperwork, the purchase price was two G's ($2,000). COLEMAN said okay and that

20

he would write it on there (deduct it from BATES bill owed to COLEMAN for cocaine). COLEMAN said he would hit BATES when he gets back. BATES then asked, "Back from where?" COLEMAN said he was on a mission. Cell site information on COLEMAN's telephone and DURANT's telephone indicated that COLEMAN and DURANT were traveling south towards Indiana, but in separate vehicles.

- On December 12, 2006, at 11:55 a.m., COLEMAN called WATSON. WATSON told COLEMAN that Jimmy (DURANT) was looking for COLEMAN and COLEMAN should call the 460 number (460-8561, DURANT's other number) right away.

- At 7:39 p.m. COLEMAN called KNOX and KNOX told COLEMAN that he still needed an hour.

- On December 13, 2006, at 8:52 a.m. KNOX called COLEMAN and asked if he was up there. COLEMAN said that he would be there in about 30 minutes, and KNOX said that he would be meeting him.

- At 9:37 a.m. KNOX called COLEMAN and told COLEMAN that he would be there in four minutes. Surveillance observed KNOX drive up to 4626 N. 52nd St. and enter the residence. COLEMAN was observed exiting the house and then reentering the house, and then KNOX exited the house. KNOX was followed directly back to 3502 W. Kilbourn Ave. (Agents believe that KNOX obtained cocaine from COLEMAN at 4626 N. 52nd St.).

- On December 14, 2006, under the direction and control of case agents, CS-7 called BOWIE and arranged a drug transaction for 4 ½ ounces of cocaine for $2,675. Later that day, CS-7 met BOWIE in the vicinity of the 5500 Block of N. 48th St. BOWIE was arrested when he met CI-7. A search of BOWIE's van incident to arrest revealed approximately 4 ½ ounces of cocaine behind the front passenger seat of the van. BOWIE was subsequently advised of his rights, waived his rights, and agreed to talk to case agents about the cocaine. BOWIE admitted that the cocaine was to be sold to CI-7. BOWIE also gave case agents consent to search his residence at 6454 N. 81st St., where case agents seized a loaded gun, 148 grams of cocaine, $20,000 cash, a digital scale and a 2002 Mercedes Benz.

- BOWIE told case agents that his principle means of income is selling drugs and knock-off clothing items. BOWIE admitted that he sells approximately an half kilogram of cocaine per week and has been doing so for about 1 ½ years. BOWIE said that for every 4 ½ ounces of cocaine he sold, BOWIE made $250-300 profit. BOWIE stated that his source of cocaine is COLEMAN and that he contacts COLEMAN by calling COLEMAN's cellular telephone. BOWIE said that he does

21

not know COLEMAN's source or other drug trafficking associates.

- On December 15, 2006, at 12:35 p.m., under the direction and control of case agents, BOWIE called COLEMAN and arranged a drug transaction for 9 ounces of cocaine for $8,175. This price included the money owed from the 4 ½ ounces of cocaine seized by law enforcement.

- At 1:17 p.m., COLEMAN called LANDRY and LANDRY told COLEMAN that he left the potato chips in the garbage can closest to the garage. Case agents believe that the cocaine COLEMAN needed to deliver to BOWIE was hidden in a potato chip bag by LANDRY near a garage.

- At 3:16 p.m., under the direction and control of case agents, BOWIE called COLEMAN. COLEMAN said he needed thirty to forty minutes.

- At 4:31 p.m., surveillance observed COLEMAN'S black Chevy dual-axle pick up truck arrive at 4151 N. 61st St. (known home address of COLEMAN) and honk the horn. At 4:56 p.m., surveillance observed the black truck park in the driveway of 4626 N. 52nd St.

- At 5:10 p.m., under the direction and control of case agents, BOWIE called COLEMAN to find out when they would conduct the transaction. COLEMAN said that it would be about twenty minutes.

- At 5:15 p.m., surveillance observed the black truck drive to 4927 W. Luscher St., another address associated with COLEMAN'S drug trafficking activities.

- At 5:29 p.m., COLEMAN called BOWIE and told BOWIE that he was pulling up. At 5:31 p.m., surveillance observed COLEMAN driving the dually truck drive up to 6454 N. 81st St. and park near the address. BOWIE said he would be home shortly.

- BOWIE was searched for contraband by case agents prior to meeting with COLEMAN and was given $8,175 in pre-recorded buy money. BOWIE was then directed to return to his residence and meet with COLEMAN. Surveillance observed COLEMAN exit his vehicle after BOWIE arrived and COLEMAN entered BOWIE's vehicle. BOWIE then received 9 ounces of cocaine contained in a potato chip bag from COLEMAN. After COLEMAN left, BOWIE went to a predetermined meet location and turned over the 9 ounces of cocaine to case agents.

- At 6:13 p.m., BOWIE (**not** under the direction and control of case agents) called COLEMAN and told COLEMAN to count the money. COLEMAN said he had not counted it (money) yet. BOWIE said it (money) would probably be short and told COLEMAN not to worry because BOWIE has it (money). Case agents believe,

despite BOWIE's cooperation with case agents during the above-described controlled buy from COLEMAN, BOWIE did not tell case agents everything about COLEMAN. Case agents believe that the above call indicates that BOWIE and COLEMAN had a prior deal for cocaine that BOWIE did not disclose to case agents.

- At 6:18 p.m., COLEMAN called BOWIE (**not** under the direct and control of case agents) and told BOWIE that it was 81 dollars and seventy five cents ($8,175.00). BOWIE told COLEMAN not to worry. COLEMAN said he would give him the other pair of shoes (cocaine) later.

- On December 16, 2006, at 10:04 a.m., BOWIE (**not** under the direction and control of case agents) called COLEMAN and asked if COLEMAN called him last night. COLEMAN told BOWIE to give him twenty or thirty minutes. BOWIE said that he had some "new boots" he wanted to sell COLEMAN anyway. Case agents believe they were talking in code and BOWIE was looking to get more cocaine without approval from case agents.

- At 3:43 p.m., BOWIE (**not** under the direction and control of case agents) called COLEMAN and told COLEMAN that it was very important that they meet. BOWIE repeated how important it was multiple times. COLEMAN said okay. Case agents believe that BOWIE intended to tell COLEMAN about BOWIE's recent law enforcement contact and to warn him that law enforcement is watching them.

- On December 20, 2006, court-authorized monitoring established that COLEMAN changed telephone numbers because BOWIE told COLEMAN to be wary of law enforcement during his drug trafficking activities.

- At 10:27 a.m., COLEMAN called LANDRY and LANDRY told COLEMAN that he had to tell him "something." COLEMAN asked LANDRY if it was good or bad. COLEMAN then told LANDRY that he would call him back from the "other phone." Case agents believe that COLEMAN obtained a new phone (target telephone #4) for his ongoing drug business because he feels that he may be a target of a law enforcement investigation. At 1:47 p.m., LANDRY called COLEMAN (target telephone #2) and told COLEMAN that Kim called and asked if COLEMAN would put up a storm door. COLEMAN said that he would call her when COLEMAN is done talking to "dude" (supplier) in Chicago.

- On December 23, 2006, at 9:50 a.m., COLEMAN (#2) called CLAYBROOKS, and left a message for CLAYBROOKS stating, "Hey, call one of them phone numbers man, I need you to get in touch with me."

- At 1:42 p.m., RAGLAND (target telephone #4) called COLEMAN (#2) and COLEMAN asked RAGLAND if "that" (target telephone #4) phone received a

23

restricted phone call because someone called his phone (#2) restricted but did not leave a message. RAGLAND told COLEMAN that nobody called the phone (target telephone #4) which was on the charger.

- At 1:43 p.m., COLEMAN (#2) called RAGLAND (target telephone #4) and RAGLAND stated "yeah...I don't know why I did that." COLEMAN then stated, "I don't know why you would call me with that number dog" (referring to target telephone #4). COLEMAN then stated, "I did not want that number on here....yeah." Case agents believe that RAGLAND realized that he made a mistake by calling COLEMAN with target telephone #4, because COLEMAN believes that he may be a target and possibly monitored.

- At 3:56 p.m., CLAYBROOKS called COLEMAN and COLEMAN immediately told CLAYBROOKS to call him at COLEMAN'S crib.

- On December 28, 2006, at 12:50 p.m., COLEMAN called Level LEE and LEE asked COLMAN if he was "good"(having cocaine). COLEMAN told LEE "yes," at which time LEE told COLMAN that he was going down to "33rd Street." COLEMAN told LEE that he would call him when he got back.

- On December 29, 2006, at 5:35 p.m., Demetrius THOMPSON called COLEMAN (#2) and told COLEMAN that he was leaving his house on "Lisbon." COLEMAN told THOMPSON to meet him "at the spot with the curve off the one way." Case Agents know this location to be 4927 W. Luscher Street, one of COLEMAN's residences. Case agents further believe, based on COLEMAN and THOMPSON's prior monitored conversations, that COLEMAN and THOMPSON planned to meet at 4927 W. Luscher in order to conduct a drug transaction.

- On December 30, 2006, at 1:11 p.m., case agents observed COLEMAN's black pick-up truck pull up and park across the street from 4927 W. Luscher Street. COLEMAN exited the driver's door and walked up to the front door of the apartment building and entered with a key.

- At 1:37 p.m., case agents observed COLEMAN exit the building and partially enter into his truck. COLEMAN then closed the truck door and walked towards the building while holding a cell phone in each of his hands. Case agents observed COLEMAN then place a call with one of the phones. Case agents monitoring the pen register and trap and trace devices on target telephones #2 and #4 during this time period observed that target telephone #4 was connected to the telephone number associated with Demetrius THOMPSON. There was no activity on target telephone #2, COLEMAN's other cell phone at this time.

- At 1:45 p.m., case agents observed a silver/bronze Nissan vehicle, bearing WI plate

number 561-GSP, drive up to and park across the street from 4927 W. Luscher Street. Case agents then observed an unknown black male (later identified as Demetrius THOMPSON) walk to the front door of the residence at 4927 W. Luscher Street and stand on the porch. THOMPSON appeared to be speaking on a cellular telephone for 30 seconds, and then return to his vehicle. Case agents observed the same THOMPSON sitting in his vehicle until approximately 1:54 p.m., at which time the THOMPSON drove away.

- At 1:56 p.m. THOMPSON, in the silver/bronze Nissan, returned to 4927 W. Luscher St. The THOMPSON exited the car and walked into the front door of 4927 W. Luscher Street. Case agents monitoring the pen register on target telephone #4 observed that target telephone #4 and THOMPSON's telephone were connected at 1:14 p.m., 1:37 p.m., 1:38 p.m., 1:42 p.m., 1:47 p.m., and 1:53 p.m.

- At 1:58 p.m., case agents observed THOMPSON exit 4927 W. Luscher St., get into the Nissan, and drive away. Case agents followed the vehicle to 6729 W. Lisbon Ave. where THOMPSON exited the car and walked past a wood fence and entered an east side door at 6729 W. Lisbon Ave. Law enforcement records indicate that 6729 W. Lisbon Ave. is the residence of THOMPSON.

## F.     Court-authorized monitoring and surveillance in January 2007

14.     Many of the calls monitored in early January 2007 indicated that COLEMAN owed DURANT a substantial amount of money for cocaine that was earlier fronted to COLEMAN. Case agents believe that COLEMAN owed DURANT approximately $150,000, the equivalent of 7-10 kilograms of cocaine at Chicago/Milwaukee wholesale prices. The calls also indicated that COLEMAN was trying to collect money from several individuals who he regularly distributes cocaine to, including Jarrell HARRIS and Eddie CLAYBROOKS. The calls further indicated that DURANT was putting pressure on COLEMAN to pay because DURANT owed the money to his supplier (Robert HAMPTON). As such, COLEMAN became increasingly desperate to gather money to pay DURANT, including making threats of violence to those who owed him money and selling his personal property, vehicles, and real estate in nominee names under his control.

- On January 12, 2007, at 8:40 a.m., COLEMAN called HARRIS and HARRIS told

25

COLEMAN that he was "waiting on this nigga man." COLEMAN told HARRIS "I need to holler at you dog, cause I might...shit...I need...one of your people to take care of something for me, man...you know what I'm say'in...cause you remember what I told you what happened." In a later section of the call, HARRIS cuts off COLEMAN and tells COLEMAN "Let me call you from the other line."

- At 8:45 a.m., HARRIS called COLEMAN and COLEMAN told HARRIS that he is going to find out where the house is at and "go in there and paint...You know what I'm saying...cause the motherfucker ain't come at me with my rent money yet...cause...shit...if...if...ah they had to pay me my rent...shit...I ain't even have to worry about what was happen'n on your end." HARRIS stated, "Exactly...but still I got to cover that."

- At 6:13 p.m., COLEMAN called DURANT and told DURANT that he did not know how long he was going to hold onto his phone. DURANT said he was trying to see him (COLEMAN). COLEMAN said he was waiting for them cats to get up with him (meaning he is trying to collect money). COLEMAN said as soon as he gets it (money form drug sales) he would get it to DURANT. DURANT said okay.

- On January 14, 2007, at 1:06 p.m., COLEMAN called HARRIS and HARRIS told COLEMAN that he was calling dude (someone who owes HARRIS money) right now and he is waiting for dude to call him back. HARRIS said he was tired of this (tired of waiting on people to pay drug debts). HARRIS then asked COLEMAN to give him an hour and he should then be able to get up with him (COLEMAN).

- At 3:54 p.m., COLEMAN called Yivana RAWLINGS (the mother of his child) at 610-9407, and COLEMAN told RAWLINGS that he was looking for another "nigga" (CLAYBROOKS) about some money, but the guy (CLAYBROOKS) would not answer the phone from his (COLEMAN's) phone so he had to call from his mother's number. COLEMAN told RAWLINGS that he asked (CLAYBROOKS), "Hey nigga what's up with my money." CLAYBROOKS replied shit has been "woo woo woo" (slow). COLEMAN then said he asked CLAYBROOKS why he was not answering COLEMAN's calls. CLAYBROOKS said he had his phone off. COLEMAN then told the RAWLINGS that he told CLAYBROOKS that CLAYBROOKS not answering the phone did not make sense because CLAYBROOKS answered the call from COLEMAN's mother's number. COLEMAN then asked where CLAYBROOKS was and CLAYBROOKS would not tell him where he was at. COLEMAN told RAWLINGS that he told CLAYBROOKS with all that ducking and dodging CLAYBROOKS knows what time it was (owes COLEMAN money). CLAYBROOKS said he was going to get up with COLEMAN. COLEMAN told CLAYBROOKS if CLAYBROOKS does not get up with him he would get up with CLAYBROOKS on sight (commit an act of violence). COLEMAN told RAWLINGS that he has to get his people (DURANT) paid, or he is not going to have any income.

26

- At 4:30 p.m., Cory Byrd called COLEMAN and COLEMAN talked about his financial problems and possibly selling the house on 11th St. COLEMAN said that he hasn't seen a guy in a month and a half and that cost him 20 ($20,000). As COLEMAN was talking about what he was going to do if he saw a guy that owed him money, COLEMAN talked to someone in the background of the call and said, "Is that him? Get your pistol." COLEMAN then told the caller that he would have to call him back.

- At 4:48 p.m., COLEMAN called Yivana RAWLINGS and asked her what she did with that pistol. RAWLINGS stated that it was in her black purse in the bedroom. COLEMAN told her that he found it and told her that "Mon" just saw that other "Nigga" around the block and that he would call her back.

- At 4:51 p.m., COLEMAN called RAWLINGS and said that it wasn't the guy he thought it was. COLEMAN said he rolled up on the car and it wasn't him.

- On January 16, 2007, at 8:34 a.m., HARRIS called COLEMAN and told COLEMAN that this nigga (person who owes HARRIS money) is supposed to have something for him today. HARRIS further stated he went over to UM's house last night and talked to UM and told him that he needs to get that money because it has been too long. HARRIS said he told UM that he (UM) has to stop playing these fucking games because he (HARRIS) has people (COLEMAN) waiting on him, and that UM has to go pick up the pace and go sell something (cocaine). HARRIS said UM told him, "T you know it's been slow." HARRIS said he told UM he was tired of that. HARRIS told COLEMAN that UM has a Suburban that he is trying to "off" (sell). HARRIS said UM should have two of them or something ($2,000). HARRIS said he was getting inpatient with it. HARRIS said UM is one of his best. COLEMAN cut HARRIS off and said people are trying to catch something too. HARRIS went on to say that he would try and get at least two ($2,000) and knock that down (reduce the drug debt owed to COLEMAN).

- At 2:48 p.m. COLEMAN called DURANT and asked DURANT "what's up?" DURANT stated he would be on the high end (Luscher Ave. stash house) in 20 minutes. COLEMAN paused and then told DURANT to call him from the other number (target telephone #5).

- At 2:49 p.m., DURANT called COLEMAN and COLEMAN told DURANT he was trying to come up with a "Dub" ($20,000), and asked DURANT if they would be able to come with a "Dub" (would the source accept $20,000 at this time). DURANT said, "yeah he would just tell them (source of supply) it was still slow". COLEMAN said he was going to put down some moves and would have something in a few days. COLEMAN said one man, his uncle (Bill DUNSON) was going to reach for him

27

(loan money). COLEMAN said he was working on his end doing what he could do because the shit got them (he and DURANT) both fucked up. DURANT said there was nothing he could do. COLEMAN asked DURANT if he had someone that could buy that house from him (COLEMAN). DURANT said he would call the real estate man. COLEMAN said if they could sell it for $55,000 or $60,000 he would give DURANT that and then they could go from there.

- On January 18, 2007, at 3:56 p.m., DURANT called COLEMAN and COLEMAN said he does not have any minutes on his (COLEMAN's) phone. DURANT asked what was up. COLEMAN told DURANT that for a fact he'll be ready Sunday or Monday and he'll have maybe four. COLEMAN said he was just waiting on one more person. DURANT said his guy (Robert HAMPTON) is getting sweated. DURANT then said that he has ten and he could it together with COLEMAN's to make it twenty. COLEMAN then asked if DURANT could hold him (supplier) until tomorrow and he would then have five. DURANT said he would take what COLEMAN had but it better be tomorrow (meaning COLEMAN better have the money together by tomorrow or Sunday). DURANT further stated to COLEMAN that they (his supplier) are sweating him. COLEMAN asked when DURANT was planning on going over there (to meet the supplier). DURANT said he was planning on doing it today but he would get back to them tomorrow.

- On January 20, 2007, at 2:20 p.m., HARRIS called COLEMAN and told COLEMAN that he (HARRIS) was going to pick 4 (amount of money) from his guy. HARRIS further stated he did not want to call COLEMAN until he had it in his hand. HARRIS said he was trying to get it right. COLEMAN told HARRIS that he (COLEMAN) had been putting down some other moves. HARRIS said he told someone that they needed to hurry up and do this because they would not be able to bounce back. COLEMAN and HARRIS then talked about being broke and HARRIS then told COLEMAN that he will call as soon as he has the four.

- At 3:11 p.m., surveillance observed a green Cadillac, with two subjects, pull up and park in front of 2210 N. 29th Street (DURANT's residence), which displayed Wisconsin plates of 542-JDX. Surveillance observed two black male subjects exit the Cadillac and enter into 2210 N. 29th Street.

- At 3:35 p.m., surveillance observed both subjects who arrived in the green Cadillac, exit 2210 N. 29th Street and re-enter in the Cadillac. The Cadillac drove off and traveled westbound on W. North Avenue. The plates listed to a 1994 four-door Cadillac Deville, registered to a Carl Outlaw (DOB: 5-22-65), of 4356 N. 26th Street.

- At 3:58 p.m., a marked MPD squad unit conducted a traffic stop on the green Cadillac at 6122 W. Appleton Avenue. The vehicle was stopped because the auto plates were suspended for an unpaid parking ticket. The driver was identified as Carl

Outlaw (B/M, DOB: 5-22-65), of 4356 N. 26th Street, home phone number of 763-3250. The passenger was identified as William W. DAVIS (B/M, DOB: 6-1-50), of 2275 N. 28th Street, and cell phone number of 899-8343.

- At 4:25 p.m., surveillance observed the green Cadillac return and park in front of 2210 N. 29th Street. Surveillance observed that DAVIS and Outlaw exited the vehicle and entered into the residence. (Agents later learned that Carl OUTLAW is a relative of Robert HAMPTON, who is DURANT's supplier).

- On January 22, 2007, at 3:28 p.m., HARRIS called COLEMAN and said when he gets out of work he was going to holler at COLEMAN because that dude just called him. HARRIS said that it would be at least 3 ½ to 4 ($3,500to $4,000), something like that. COLEMAN said it was better then nothing and it was right on time. HARRIS said he was trying to chop it (drug debt) down. COLEMAN said that his man was going to give him the other. HARRIS said at least they could get back on deck and then it would really be made up.

- On January 23, 2007, at 4:16 p.m., DURANT called COLEMAN and told COLEMAN that he was just pulling in. DURANT then asked if COLEMAN'S guy was on 52nd St. (4626 N. 52nd St.). COLEMAN replied that his guy should be there. DURANT said he wanted to stop by 52nd and grab a "saw" and drop it off to "Skip." COLEMAN said he wanted to switch cars with DURANT because he was about to go on the highway. COLEMAN asked if DURANT had to go back (Chicago). DURANT said he had to go back in a couple days. DURANT said he wanted COLEMAN to meet DURANT at 52nd St. COLEMAN told DURANT that he was on 28th St. and wanted DURANT to meet him there instead.

- At 4:27 p.m., FERGUSON called COLEMAN and asked COLEMAN if he was straight (had cocaine). COLEMAN said that he was and probably was going to be moving around tonight or tomorrow (making deliveries). COLEMAN said that he is good though.

- At 4:36 p.m., COLEMAN called FERGUSON and 11 minutes into the conversation FERGUSON told COLEMAN that his girlfriend had just seen the green (marijuana)...."that soul food and that she had never seen that other white girl (cocaine) never." FERGUSON went on to say that his girlfriend knows what it is.

- On January 27, 2007, at 12:26 p.m., surveillance observed DURANT enter into a black GMC truck, registered to COLEMAN's known associate, Michael BIAS. Surveillance observed DURANT drive off westbound and stop at a gas station.

- At 12:57 p.m., DURANT attempted to call HAMPTON but there was no connection. At 12:59 p.m., DURANT chirped HAMPTON, but there was no connection. Within

29

seconds, HAMPTON chirped DURANT. There was no audio recorded due to a computer malfunction, but the connection lasted 51 seconds.

- At 3:04 p.m., surveillance observed the black GMC truck pull up to the parking lot entrance gate at the Riverwood Condominiums at 13713 S. Stewart St. in Riverdale, IL. Moments later the gate opened and the GMC truck pulled into the parking lot between the buildings with the addresses of 13713 and 13715. Surveillance had to relocate because the vehicle parked out of their sight. When surveillance re-acquired a view of the GMC truck, no occupants were observed.

- Also at 3:04 p.m., surveillance observed DURANT arrive at the Riverwood Condominiums and gaining access to the secured parking lot. Case agents believe that DURANT contacted HAMPTON upon his arrival and HAMPTON remotely opened the parking lot gate for DURANT to enter with the black GMC truck.

- At 3:16 p.m., surveillance observed DURANT exit 13715 S. Stewart St. with a black male and two black females. Two other black males also exited the same door. All of the subjects walked over to the trunk area of a blue Cadillac STS bearing IL plate TAXCUT7. IDOT records show the plate lists to Elmer K. Mackey, 540 E. 147th Pl., Harvey, Illinois, on a 2002 Cadillac 4-door.

- At 3:19 p.m., DURANT and the two females and one male entered the black GMC truck and DURANT drove the vehicle out of the lot. Surveillance was unable to follow the GMC truck as it left the parking lot. The two other black males that exited the door at 13713 re-entered the building through the same door. The Cadillac STS remained on the scene. Due to the amount of foot traffic and possible counter surveillance, surveillance tried to re-position their vehicle, but lost sight of DURANT.

- At 8:49 p.m., surveillance observed the black GMC truck parked at 4927 W. Luscher Ave., Milwaukee, WI. At 8:56 p.m. surveillance observed the DURANT drive off from Luscher Ave. and was lost in traffic. At 9:29 p.m., surveillance observed DURANT driving the GMC truck at N. 35th St. and Meinecke. At 9:31 p.m., surveillance observed DURANT arrive and park the GMC truck in front of DURANT's residence at 2210 N. 29th St.

- At 9:32 p.m., surveillance observed DURANT exit the GMC truck carrying what appeared to be a duffle bag with long straps. DURANT went to the front porch and entered the residence. At 9:40 p.m., surveillance was terminated.

- On January 31, 2007, at 9:05 a.m., DURANT called COLEMAN and DURANT told COLEMAN that he needed the black truck. COLEMAN told DURANT that the truck was at COLEMAN's house. COLEMAN then asked if DURANT heard

30

anything (from his supplier, HAMPTON). DURANT said he had not and that he would call (HAMPTON).

- At 11:20 p.m., FERGUSON called COLEMAN and COLEMAN said he did not hear anything yet and they are still waiting (for cocaine). COLEMAN then said that he (DURANT) was still waiting to see what was what (with HAMPTON). COLEMAN further stated the day had just begun and he did not know if he (DURANT) was going to call him today.

- At 6:18 p.m., FERGUSON called COLEMAN and asked if COLEMAN had good news. COLEMAN said no not yet....not yet.....just waiting dog. FERGUSON said "Man.. C.. I'm ....it's fucking me up dog...I don't know about you but it's fucking me up dog.... I ain't doing." COLEMAN said "it's real fucked up dog, he's (COLEMAN) the only reason why he had to come to FERGUSON said stop it that he was in the whole dog." COLEMAN asked if FERGUSON got that (money) from dude. FERGUSON said he couldn't he had to pay his bills. COLEMAN said okay. FERGUSON said it was too much pressure on him. FERGUSON said he ain't been in this predicament probably for years. COLEMAN said yeah. FERGUSON said he had to pay him man cause he (FERGUSON) done accumulated too much and had to pay him. FERGUSON said he was supposed to go to court today for the revenue because he ain't paid his quarterly for and he called them and told them he ended up sending it through. COLEMAN said okay. FERGUSON said he had to pay him man. COLEMAN said he knows. FERGUSON said he tried to, he felt like a motherfucker, if he did not have to pay him he could of kept playing low. FERGUSON said he would of did it, kept playing low cause he knows once he jumps it a been good. COLEMAN said yeah he knows it going to happen dog, its going to happen, its just you know mother fuckers man they just dead out, they (HAMPTON) told dude (DURANT) they were going to be there Friday because he (DURANT) needs the (money) . COLEMAN said he (DURANT) was even crying like that shit because they (HAMPTON) been calling him (DURANT) and told him (DURANT) that it was all good, shit it's been happening time and time again. FERGUSON said he wished he was not in the predicament to COLEMAN that and still have enough for him to keep. "You know what I am saying." But he had to empty out his eggs, all of them. COLEMAN said okay. COLEMAN said if he had to find another way he would grab it from somebody and then just "give it to you' cause you know as soon as he (COLEMAN) goes down there and get it from him (HAMPTON) that it when a mother fucker going to be like we here. COLEMAN said he knows that is how it's going to happen. COLEMAN said they got to do what they got to do. FERGUSON said he knew they were on two different levels, he wished he had what COLEMAN had because he ain't got shit man. FERGUSON said he wished he had extras that he could be like here "I'm going to give it to my guy, let me keep going, cause COLEMAN is like a friend to him like that. FERGUSON further said that his back was against the wall, he said that he would not lie to COLEMAN. COLEMAN said

31

if his back was not against the wall it would never be a problem. FERGUSON then said he was pulling up.

- At 6:34 p.m., DURANT called COLEMAN. COLEMAN asked if DURANT heard anything. DURANT said no and since they (HAMPTON) had not called him and he would call them (HAMPTON). COLEMAN said his guy (FERGUSON) was on him.

- At 10:01 p.m., DURANT called HAMPTON and HAMPTON told DURANT that he has not heard any good news, he was waiting on them, he called that "nigga (HAMPTON's supplier) and that nigga said he was going to call back and he didn't."

## G.  Court-authorized monitoring and surveillance during February 2007.

- On February 5, 2006, at 3:56 p.m., DURANT called COLEMAN and told COLEMAN that he got the okay (from HAMPTON that the cocaine was in) and he was going to need COLEMAN's vehicle. COLEMAN said okay. DURANT said he was going to leave after 5:00 p.m.

- On February 5, 2006, at 8:50 p.m., DURANT chirped HAMPTON. HAMPTON asked if DURANT left yet. DURANT said no because he was waiting on dude to bring him the hoop ride.

- At 9:21 p.m., DURANT called COLEMAN and told COLEMAN that he was up there (4927 W. Luscher Ave.). COLEMAN asked what DURANT was driving and DURANT said the BMW.

- At 11:29 p.m., HAMPTON chirped DURANT and DURANT said he was waiting on a ride to come through. DURANT said his guy (COLEMAN) was not around and was waiting for him (COLEMAN) to drop it off.

- On February 6, 2007, at 11:10 a.m., HAMPTON chirped DURANT . DURANT said he was on his way to HAMPTON (13713 S. Stewart, Riverdale, IL).

- At 1:32 p.m., DURANT chirped HAMPTON and told HAMPTON that he was at the gate. At this time, case agents observed DURANT and an unknown black female arrive at 13713 Stewart St. in the black GMC Denali truck. DURANT has driven this vehicle to 13713 S. Stewart St. in the past. DURANT and the unknown female walked into 13713 S. Stewart St.

- On February 8, 2006, at 1:31 p.m., HARRIS called COLEMAN. HARRIS said, "Motherfuckers done fell up under the ground, man." COLEMAN said, "Like the motherfucker that has been working on the house." HARRIS said, "Man (COLEMAN) got dirt all up under them fingernails and everything." HARRIS

32

laughed. COLEMAN said he was over there the other day, man, and they (DURANT's supplier, HAMPTON) just had a motherfucker waiting' around, man. COLEMAN said, "Yeah, man, and then they called today like, like, uh, I guess the reason they ain't came cuz the rest of that little thing got to be paid off, so...so I'm trying to figure that end out now. HARRIS asked how much it was and COLEMAN said "like 13 ($130,000)." COLEMAN said that it was not all him though. HARRIS said, "Yeah, a nickel ($5,000 or $50,000) is on my end." COLEMAN said he does "even owe the rest of that, Cuz, shit, I did some other moves and got this damn near out the way." COLEMAN said his man (DURANT) was "kinda scratching his (wanted his money)." COLEMAN said he was trying to make something else happen so he could. HARRIS interrupted and said help him (DURANT). COLEMAN said whatever he had to do. COLEMAN said that's was the real beat. HARRIS said even if he had some mother fuckers that'd just send (get money together to give to DURANT so he could pay HAMPTON) them. COLEMAN said exactly. COLEMAN said he did not want to fuck with other. HARRIS said it had to be one three? ($130,000). COLEMAN said he was going to see what he (DURANT) came up with. COLEMAN said If they could get somebody to send at least half or something (COLEMAN is saying that if they got half the money together HAMPTON would deliver cocaine to DURANT). HARRIS told COLEMAN to call him and just check with him and see what's happening and he probably could check with a couple people, you know (help collect money to obtain cocaine). COLEMAN said that was the hold up though. "You know, you know, and, and shit, you know, they waited this long to tell a motherf..." HARRIS said if a mother fucker got close he would have something else. COLEMAN said exactly. (meaning they would be right again). HARRIS said they (HAMPTON) had to understand. COLEMAN said for sure and because of this he was selling everything, he was trying to put that mother fucking. HARRIS said if they (HAMPTON delivers cocaine) come on he guarantee's it would be there (HAMPTON would get all of the owed money). COLEMAN said they know that too and if he could put in his pocket like 500... HARRIS said the longer they wait they were going to be dead. COLEMAN said if he could come up could come with like 5 or 6...he could get after him (DURANT). HARRIS said Yeah. COLEMAN said Motherfucker (DURANT) just hafta go and talk to 'em, (HAMPTON) man. HARRIS said he would see what he could pull up from his end. COLEMAN said they got too, Little thirteen hundred dollars, man. COLEMAN said then he could pay them motherfuckin' little bills off.

- On February 9, 2007, at 12:29 p.m., HAMPTON chirped DURANT. DURANT said he would be by HAMPTON shortly (13713 S. Stewart Ave.)

- At 3:58 p.m., DURANT chirped HAMPTON. DURANT said he was at the gate (13713 S. Stewart St., Riverdale, IL). HAMPTON said okay. At 3:59 p.m., surveillance observed COLEMAN's black dual-axle truck pull up to the security gate at the south parking lot of 13713 S. Stewart St, Riverdale, IL. After a short time of

33

sitting at the gate, the truck entered the lot and parked. DURANT and two unknown black females exited the truck and entered the building. After a couple of minutes, DURANT and the same two females exited the building, entered the truck, and drove two blocks east (Union St.) of Halstead, on 145th St. On route to the address, DURANT drove erratically by making U-turns and driving around numerous blocks that were out of the way before dropping off the two females off at a residence.

- At 4:35 p.m., an unidentified female (UF) using HAMPTON's phone chirped DURANT and DURANT said he was at the gate. The UF said, "I figured that's what you wanted." Surveillance then observed DURANT drive the black dual-axle truck through the security gate for 13713 S. Stewart St.

- On February 13, 2007, at 3:18 p.m., DURANT called HAMPTON and DURANT asked if it was snowing that way yet. HAMPTON said it had not started yet. DURANT said he was going down south so he could get that money, so he could ride down there for like three to four days and just stop by HAMPTON and knock him out because it should not take but two days with HAMPTON.

- At 4:27 p.m., an unidentified male (350-4747) called DURANT and asked if DURANT was going down south (Chicago or Memphis) and whether "dude" (COLEMAN) paid DURANT the money owed to DURANT. DURANT said he had not got any money from COLEMAN and that COLEMAN was in Michigan.

- On February 18, 2007, at 11:53 p.m., Patryce PRUITT called DURANT and said that "David" called her to ask her about the price for 4 speakers and an amp ( 4 ½ ounces of cocaine). DURANT said 28 dollars ($2800 dollars). PRUITT said she wanted to sell it to David for 32 dollars ($3200). DURANT told PRUITT to sell it to David for 28 dollars.

## H.  Court-authorized monitoring and surveillance during March and April 2007.

15.  Calls monitored during the last two weeks of March and the first two weeks of April 2007 indicated that DURANT was still waiting for a $55,000 check to come from a property he sold in Memphis, Tennessee. DURANT told individuals the check was to be delivered to him on Tuesday, April 16, 2007. DURANT was also made arrangements for someone to run his day car business at 2577 N. 28th St. DURANT also had several conversations with HAMPTON and other drug trafficking associates regarding the availability of cocaine and marijuana. Below are summaries

34

of some the calls concerning the above information:

- On March 3, 2007, at 8:14 a.m., DURANT called PRUITT and PRUITT asked DURANT if he was still in Memphis. DURANT said he would be back no later then Sunday. PRUITT said she needs to get that (cocaine). PRUITT asked if Cal (COLEMAN) was straight or whether he'd been going to work (i.e. able to sell cocaine). PRUITT then asked whether DURANT knew anybody that had cocaine available to sell, because "Dave" had been constantly bothering her for cocaine. PRUITT told DURANT she gave Dave some of that "bubble gum" (cocaine), and he wanted more. DURANT said he did not know.

- On March 4, 2007, at 7:56 p.m., COLEMAN called DURANT and talked about properties. DURANT told COLEMAN he might have some good news in a couple days. COLEMAN said he had just been waiting around and it had been so long that he did not think about it no more but it would be damn good. DURANT said he was looking at a five bedroom brick house selling for $69,000.00. COLEMAN said he might be looking to move also because he was tired of renting and being a landlord. DURANT said as soon as he can get that daycare (907 W Atkinson) up and running it would be all good and then he could leave (go move to Tennessee). COLEMAN said he was working on his houses. DURANT said he would get that daycare running, then he could hit it. COLEMAN said that DURANT did not have the mortgages over his head like COLEMAN has. DURANT said the house on 29th St. (2210 N. 29th St.) had some bullshit going on. DURANT said they (Habitat for Humanity) were planning on taking the house back because the other guy was in jail. DURANT said he would buy the house from them if he could work it out. COLEMAN also told DURANT that DURANT could live in Tennessee and he (COLEMAN) would take care of everything on the other end (here in Milwaukee). COLEMAN said that way DURANT would only have to come up here every two to three weeks and he would make sure everything would be straight.

- On March 6, 2007, at 12:31 p.m., HAMPTON called DURANT and DURANT said he was loading up the truck up. HAMPTON asked DURANT if he had that (money) together for SON (supplier) so they can go ahead and get cracking. DURANT said he was waiting on that change (i.e. still collecting money). DURANT said he would talk to HAMPTON when he got there. It should be noted that DURANT had been in Memphis Tennessee renovating a property that he was trying to sell for $55,000.00.

- At 9:12 p.m., DURANT informed HAMPTON also that he was at the gate (13713 S. Stewart St., Riverdale, IL).

- On March 7, 2007, at 9:20 a.m., HAMPTON called DURANT and asked him when he wanted to come do that bedroom. HAMPTON said he would be ready any time

that day. Case agents believe HAMPTON told DURANT that he should be receiving cocaine that day. DURANT said he would be on over and to give him an hour or so.

- At 9:37 a.m., HAMPTON called DURANT and told him not to move. HAMPTON said he was going to call DURANT back at 10:30 a.m.

- At 11:19 a.m., DURANT called HAMPTON and told him that he (SON the supplier) said 96 ($96,000), and that by the time DURANT got there, it should be cool. Case agents believe HAMPTON informed DURANT that in order for DURANT to obtain cocaine, he would have to bring an additional $96,000 for the previous owed cocaine debt.

- At 11:20 a.m., HAMPTON called DURANT and told him not to bring anyone with him that's going to be crying. Case agents believe HAMPTON is telling DURANT not to be upset by the amount of cocaine he obtains.

- At 1:37 p.m., DURANT called Dollar Rent a Car at 866-434-2226 and booked a rental until March 9, 2007, for a 2006 white Dodge Magnum. Durant was later observed driving this vehicle which had Wisconsin registration plates of 203-LUR.

- At 4:57 p.m., case agents observed DURANT exit 2210 N. 29th St. carrying a suitcase and a garment bag. DURANT placed the items in the trunk of the rental vehicle (Dodge Magnum). The vehicle was followed as it traveled onto the freeway and headed southbound.

- At 5:25 p.m., DURANT called HAMPTON and HAMPTON told DURANT that it was slow motion. HAMPTON told DURANT that he has left a message with "Dude" and maybe his phone is dead. HAMPTON was waiting on him and his phone to be turned back on. After DURANT talked to HAMPTON, DURANT was observed turning around and getting back on the freeway traveling northbound towards Milwaukee.

- At 5:55 p.m., DURANT was observed parking the rental car at 4927 W. Luscher Ave. There were no further calls between HAMPTON and DURANT.

- On March 8, 2007, at 6:22 p.m., HAMPTON called DURANT and said he thought it went down (supplier received cocaine) but he had not talked to him (SON). HAMPTON said he was not going to let anyone move unless he knew for sure. DURANT told HAMPTON that he had to have the car (rental car) back by 3:00 p.m., tomorrow.

- On March 11, 2007, at 7:25 p.m., HAMPTON called DURANT and said he may see him (SON) some time that week. HAMPTON said he would call in the morning and

it (cocaine transaction) should happen then.

- On March 15, 2007, at 5:18 p.m., HAMPTON told DURANT that he was trying to get the little packet (cocaine) together so people could stop tripping. DURANT said he had to wait for his sister to get back so he could borrow it from her. DURANT told HAMPTON he wanted like five of them (kilograms of cocaine) but has to go down (Memphis) to get that check (money from the sale of the house). HAMPTON told DURANT that it should happen next week. HAMPTON said that he has to go down Sunday and could pick that up on his way back on Monday or Tuesday. Case agents believe HAMPTON believed that cocaine would be available the next week.

- On March 17, 2007, at 8:14 a.m., PRUITT called DURANT and told him that she was going to get money at 9:30 a.m. and wanted DURANT to come and get it because she didn't not want to ride around with it and didn't want it in her house.

- On March 27, 2007, at 1:12 p.m., DURANT received an incoming call from HAMPTON. DURANT told HAMPTON that he would be getting a check today (for sale of a house in Memphis, TN). DURANT said that he would get a loan out of the house from TC Home Improvements (case agents believe that DURANT uses the name "TC Home Improvements" to shelter his money laundering activities from law enforcement).

- On March 28, 2007, at 9:30pm, DURANT called 610-6283 (Subscriber-James Smith) and told the UM that he hasn't called because he's been busy with his day care business. DURANT said that he is paying for the place, but he isn't getting anything in return (case agents know that DURANT is referring to the house at 2577 N. 28th St. and that he is paying the mortgage, but the house is vacant so he does not have any rental income at this time).

- On March 29, 2007, at 12:55 p.m., DURANT received an incoming call from 550-7343 (Unknown Subscriber). The UM told DURANT that he had a $1,800.00 money order that he wanted to give to DURANT. DURANT told him to make the check out to TC Home Improvement.

- On April 3, 2007, HAMPTON called DURANT and DURANT asked if it was slow. HAMPTON said that it was looking good this weekend for sure (cocaine supply would be available). DURANT said he was working on the day care house (2577 N. 28th St.) trying to get it together. DURANT said he was hoping to make about six grand a month from two day cares. DURANT said he could take eight kids and would get $1600.00 a week. DURANT then said he was still waiting on that mother fucker down there regarding the house sale. HAMPTON said when he gets the okay (obtains cocaine) DURANT would be the first person he calls.

37

- On April 6, 2007, DURANT told HAMPTON that he is going tomorrow. HAMPTON told DURANT that he should know something when he (DURANT) comes this way and would let DURANT know if he should ride up or what. HAMPTON said he was waiting for the guy (his supplier) to call him and that he (HAMPTON) called him (Supplier) about 3:00 p.m. and the guy told him he was going to get the phone and make a call and see if they are ready to make a move. HAMPTON said he was hoping the guy was going to call soon, he said everything is cool but the guy went on vacation for 5 days.

- On April 9, 2007, HAMPTON called DURANT and told DURANT that everyone down here (in Chicago) was "tripping and shit (cocaine) ain't moving."

- On April 11, 2007, HAMPTON called DURANT and told DURANT that he talked to his guy (supplier/SON) who said that it will be this weekend (cocaine will be available). DURANT told HAMPTON that DURANT talked to his guy in Memphis and expects his check after the closing.

- On April 11, 2007, DURANT called COLEMAN and COLEMAN told DURANT that something has to break (meaning COLEMAN is hoping for a cocaine shipment to come in). DURANT said it should break soon. DURANT then talked about getting another property to turn into a day care so he can make $7,000 a month.

- On April 12, 2007, UM (901-503-8651/Edward Gibson) called DURANT and said the check was going to be $55,000 and the check should arrive on Tuesday (April 16, 2007).

## I.    April 16, 2007 arrest of Jimmie L. DURANT and post-arrest statement

16.    On April 16, 2007, at 5:23 p.m. case agents arrested Jimmie L. DURANT. DURANT was advised of his rights and agreed to be interviewed by case agents. DURANT stated that he wanted to cooperate with law enforcement and provided information to case agents regarding his supplier and customers. DURANT further stated that he could obtain cocaine from his supplier. DURANT stated that he currently resides at 2210 N. 29th St. DURANT stated that he has a Sprint cell phone with the phone number of 414-460-8561 and a Nextel phone with the number of 414-304-4618. DURANT stated that he owns the property at 2577 N. 29th St. which he is attempting to turn into a day care facility. DURANT stated that he lived in Apartment #3 at 4927 W. Luscher

38

Avenue.

17.    Regarding his drug activity, DURANT stated that he has been selling cocaine at the kilogram level for approximately thirteen months. DURANT stated that he would pick up 10-15 kilograms of cocaine twice a month from a supplier in Illinois. DURANT stated that he would average approximately twenty kilograms of cocaine a month for the last thirteen months (approximate total is 260-390 kilos). DURANT identified his supplier as Robert HAMPTON, who lives in an apartment complex located on Stewart Street (Case Agents know this to be in Riverdale, Illinois). DURANT stated that HAMPTON is wheel chair disabled from a past gun shot wound which paralyzed HAMPTON.

18.    DURANT stated that he and HAMPTON would talk by phone to determine when a cocaine shipment would be available. DURANT would then rent vehicles from Dollar Rental located at the Mitchell Field Airport for travel to Illinois. DURANT would then travel to HAMPTON's apartment where he would meet with HAMPTON's stepson. DURANT knows that the stepson goes by the nicknames of "Son" or "Hyde". Upon DURANT'S arrival, "Son" would place a phone call to someone at which time two Hispanic runners would show up shortly thereafter. DURANT would see HAMPTON or "Son" put down a bag of money and then observe the Hispanic runner(s) put down a bag of kilograms of cocaine. DURANT stated that he has personally seen thirty kilograms of cocaine at one time inside of HAMPTON'S apartment. DURANT was told by "Son" that "Son" had received as much as fifty kilograms of cocaine at one time from the Hispanic runners. DURANT stated that the money/kilogram exchange would either occur in HAMPTON'S apartment or in another apartment within the building that HAMPTON or "Son" had access to. After the exchange with the Hispanic runner(s), "Son" would give DURANT a bag with kilograms of cocaine.

39

DURANT stated that he would place the bag of cocaine in the back seat of his car and drive back to Milwaukee. DURANT stated that he would take the cocaine back to his apartment at 4927 W. Luscher Avenue.

19.     DURANT stated that he supplied three subjects within the Milwaukee area. DURANT identified the subjects as "Cal," identified by case agents know as Calvin COLEMAN, and two other black males. DURANT stated that he would give "Cal" approximately seven kilograms, One subject two kilograms and the other subject one kilogram. DURANT said he would give the kilograms of cocaine to these subjects and collect the money at a later time. DURANT stated that he would collect money from these individuals separately. DURANT stated that "Cal" would give him a bag of money, and that DURANT would take out his cut and leave the rest in the bag. DURANT stated that he would do the same thing for the other two subjects. DURANT would then transport the money to HAMPTON without counting it. DURANT stated that the money would be in three separate bags and HAMPTON would tell him if any bag was short money. At one point, DURANT stated that he owed HAMPTON approximately $294,000 for fifteen kilograms at $19,500 a piece. DURANT stated that he believed that "Cal" had been ripped off for a kilogram and a half of cocaine, which caused him to be short on money to repay DURANT. DURANT stated that "Cal" came up with most of the monies owed but DURANT still had to pay $13,000 out of his own pocket. DURANT stated that "Cal" still owed him $7000.00 to date. DURANT stated that one of the other subjects still owes him money but he was unsure how much. DURANT stated that the last time he received cocaine from HAMPTON was right before Thanksgiving when he received 10 kilograms.

20.     Between April 16, 2007 and May 1, 2007, DURANT provided additional information on subjects within the organization. On May 2, 2007, case agents received information that

40

DURANT did not want to travel to Riverdale, IL with case agents for the purpose of repaying a drug debt to Robert HAMPTON because DURANT feared for his safety. Case agents were becoming increasingly skeptical of DURANT being truthful with agents because DURANT's supplier, Robert HAMPTON, suddenly dropped both of his cellular phones. Case agents believe that DURANT told HAMPTON that the police had arrested him and were now investigating HAMPTON.

21.     On May 8, 2007, COLEMAN was arrested by case agents for his involvement in the above-described offenses. COLEMAN was advised of his rights, indicated he understood his rights and asked to speak with a lawyer. COLEMAN was allowed to call a lawyer. After speaking with a lawyer, COLEMAN agreed to be interviewed by case agents. COLEMAN identified Jimmie L. DURANT and said that he met DURANT in prison. For the past two years, DURANT has been supplying COLEMAN with 3-5 kilograms of cocaine every 2-3 weeks. COLEMAN pays DURANT $19,500.00 per kilogram. COLEMAN said he sells 4 ½ ounces for $2,800, 9 ounces for $5,600, and a kilogram for $20,000. COLEMAN stated that DURANT's source for the cocaine is in the Chicago area, but does not know the person. COLEMAN said that DURANT gets 5-10 kilograms of cocaine from the source in Chicago each time DURANT goes to get cocaine.

22.     COLEMAN identified Daryl BATES and said that he sold approximately 3.5 grams of cocaine per week to BATES for $100.00.

23.     COLEMAN identified Eddie CLAYBROOKS and said that he sold 4 ½ ounces of cocaine to CLAYBROOKS twice for $2,800.00 per 4 ½ ounces. COLEMAN said that CLAYBROOKS still owes him $1,400.00 for the last 4 ½ ounce deal.

24.     COLEMAN identified JARRELL HARRIS (Rel) and said that he has known HARRIS since they were kids. HARRIS is the nephew of Travis LANDRY. COLEMAN said that

41

HARRIS has supplied COLEMAN with approximately 5 kilograms of cocaine, one kilogram at a time. COLEMAN said that he supplied HARRIS with cocaine on 7-8 occasions, 1-2 kilograms each time. COLEMAN sold the cocaine to HARRIS for $20,000.00 per kilogram.

25.     COLEMAN identified Darin BOWIE and said that he has known BOWIE since sometime in the 1980's. COLEMAN sold cocaine to BOWIE in 4 ½ to 9 ounce amounts. On one occasion, COLEMAN sold BOWIE 27 ounces. COLEMAN stated that after a deal in December 2006 (December 14, 2006), BOWIE told COLEMAN that one of BOWIE's guys set BOWIE up with the police and that COLEMAN should lay low.

26.     COLEMAN identified Lindsey FERGUSON and said that he sold cocaine to FERGUSON approximately 7 times, 4 ½ ounces amounts 4 times and 9 ounce amounts 3 times. COLEMAN stated that he "fronted" the cocaine to FERGUSON on each occasion.

27.     COLEMAN identified Kenya RAGLAND and said that he and RAGLAND are cousins. COLEMAN said that he has raised RAGLAND since childhood. RAGLAND assisted COLEMAN with drug trafficking activities, but routinely stole cocaine from COLEMAN, 1/4 to ½ ounce at a time.

28.     COLEMAN identified Doniay KNOX and said that he sold 1/4 to ½ ounce of cocaine to KNOX twice a month.

29.     COLEMAN identified Level LEE and said that he sold 4 ½ ounces of cocaine to LEE 4-5 times.

30.     COLEMAN identified Demetrius THOMPSON and said that he sold THOMPSON 1 ounce of cocaine 3-4 times.

31.     On May 9, 2007, case agents executed federal search warrants at locations associated

with COLEMAN and DURANT. The following items of notes were seized at the following locations:

>   a.   Personal Touch Car Wash, 3716 W. North Avenue, Milwaukee, Wisconsin (Coleman's business) - six assault rifles, including one with a silencer that appears to be fully automatic, a sawed-off shotgun, and several high capacity magazines. All of the firearms were loaded with ammunition;
>
>   b.   4151 N. 61st Street, Milwaukee, WI (Coleman's residence) - 9mm semi-automatic firearm.

32.    On May 9, 2007, after being advised of his rights, Travis LANDRY agreed to be interviewed by case agents. LANDRY said that he has known COLEMAN for several years and that he is aware that COLEMAN is cocaine trafficker and that DURANT supplies cocaine to COLEMAN. LANDRY stated that Jarrell HARRIS is his nephew and that LANDRY introduced HARRIS to COLEMAN. LANDRY stated that often when HARRIS wanted to get in touch with COLEMAN to get cocaine, HARRIS would call LANDRY to get through to COLEMAN. LANDRY was aware that COLEMAN was supplying kilograms to HARRIS. LANDRY remembered specific conversations in November 2006 between he and COLEMAN about money that HARRIS gave COLEMAN for cocaine. LANDRY called COLEMAN several times for HARRIS to get HARRIS's money back or get the cocaine from COLEMAN. LANDRY said that the term "tools" was code for cocaine.

## IV.    CONCLUSION

33.    Based on the above information, your affiant believes that probable cause exists to believe that the individuals listed below did knowingly and intentionally commit violations of Title 21, United States Code Sections 841(a)(1), 841(b)(1)(a), and 846, conspiracy to possess with the intent to distribute and distribute in excess of five (5) kilograms of a mixture or substance containing

43

a detectable amount of cocaine, a Schedule II controlled substance:

- CALVIN L. COLEMAN, a.k.a. "C" (B/M, DOB: 12-16-68)

- JIMMIE T. WATSON (B/M, DOB: 1-24-59)

- KENYA RAGLAND (B/M, DOB: 1-13-76)

- JARRELL A. HARRIS (B/M, DOB: 10-18-75)

- EDDIE CLAYBROOKS (B/M, DOB: 10-22-73)

- LEVEL LEE, a.k.a. "Big D" (B/M, DOB: 6-29-71)

- DONIAY M. KNOX (B/M, DOB: 12-9-69)

- LINDSEY K. FERGUSON (B/M, DOB: 3-6-73)

- JIMMIE LEE DURANT (B/M, DOB: 7-24-70)

- ROBERT HAMPTON (B/M, DOB: 12-16-68)

34.     Based on the above information, your affiant believes that probable cause exists to

believe that the individuals listed below knowingly and intentionally used a communication facility,

to wit: a telephone, in committing, or in causing and facilitating the commission of an act or acts

constituting the distribution of a controlled substance, a felony under the provisions of Title 21,

Chapter 13, Subchapter I, of the United States Code, in violation of Title 21, United States Code,

Section 843(b):

- DEMETRIOUS A. THOMPSON, (B/M, DOB: 8-9-73)

- PATRYCE PRUITT (B/F, DOB:2-7-78)

35.     In addition to the requested criminal complaints, your affiant is requesting arrest

warrants for the following individuals:

- JIMMIE T. WATSON (B/M, DOB: 1-24-59)

44

- KENYA RAGLAND (B/M, DOB: 1-13-76)

- JARRELL A. HARRIS (B/M, DOB: 10-18-75)

- EDDIE CLAYBROOKS (B/M, DOB: 10-22-73)

- DONIAY M. KNOX (B/M, DOB: 12-9-69)

- LINDSEY K. FERGUSON (B/M, DOB: 3-6-73)

- ROBERT HAMPTON (B/M, DOB: 12-16-68)

45